USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/3/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
                                    :   04 Civ. 2112 (TPG)
In re China Life Securities Litigation :
                                    :   **OPINION**
                                    :
                    Defendant.      :
------------------------------------x

      This is a class action brought on behalf of purchasers of stock in defendant China Life Insurance Company Limited ("China Life"). The action is against China Life and certain of its officers and directors for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The proposed class consists of those who purchased the stock on the New York Stock Exchange and the Hong Kong Stock Exchange between December 17, 2003 and April 28, 2004.

      Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b) for failure to state an adequate claim. Defendants also move under Rule 12(b)(1) to dismiss the complaint for lack of subject matter jurisdiction as to foreign purchasers who acquired the stock on the Hong Kong Stock Exchange.

      The court rules that it has no subject matter jurisdiction over foreigners who purchased on the Hong Kong exchange. As to purchasers on the New York Stock Exchange or any other exchange in the United States, or Americans who purchased anywhere, there is subject matter jurisdiction. However, the court must rule on the motion to dismiss. For reasons described

below, the Rule 12(b)(6) motion will be treated as a motion for summary judgment, and as such, it is granted.

For its factual discussion in this opinion, the court relies, in the first instance, on the Amended Complaint. In addition the court will refer to (1) the list of the closing stock prices[1] of China Life on the New York Stock Exchange during the relevant period, (2) certain Forms 6-K of China Life filed with the Securities and Exchange Commission, (3) a letter from the SEC to China Life dated April 26, 2004, and (4) an audit decision dated March 30, 2004, issued by the National Audit Office of the People's Republic of China.

Since matters outside the complaint will be referred to, the court will treat the Rule 12(b)(6) motion as one for summary judgment under Rule 56. See Rule 12(d).

## Facts

China Life had a predecessor company named People's Insurance Company of China ("PICC"), formed in 1949 after the Communist Party took power in China. It initially held a monopoly on a variety of types of insurance. The monopoly was slowly dismantled, and in 1999 PICC was split into four different insurance companies. One of the four was the China Life Insurance Company, referred to as "Old CLIC" in the complaint. Old CLIC sold policies

---

[1] ADR's were traded on the New York Stock Exchange. However, consistent with the treatment by the parties in this action, the court will refer to them as "stock."

wherein customers received payments after retirement with a guaranteed rate of return. Due to cuts in interest rates by the Chinese central bank, these policies became unprofitable as Old CLIC was obligated to pay out more to policyholders than it earned from bank deposits. Old CLIC attempted to generate revenue in a number of ways, some of which ran afoul of Chinese law. Old CLIC then attempted to save its business by restructuring itself into two new companies, one parent and one subsidiary: "New CLIC" (the parent) and China Life (the subsidiary), China Life being a defendant in this action. Under the restructuring agreement, unprofitable insurance policies were assigned to New CLIC, and China Life was assigned the profitable policies. New CLIC was also responsible for all fines arising out of Old CLIC's prior acts. The two entities were created in June 2003.

Thereafter, steps toward a public offering of China Life stock were taken. China Life filed a registration statement with the United States Securities and Exchange Commission on November 20, 2003. The initial public offering took place on the New York Stock Exchange on December 17, 2003, and on the Hong Kong Stock Exchange on December 18, 2003. The stock was traded thereafter on both exchanges. References hereafter to stock prices will relate solely to prices on the NYSE.

The complaint correctly alleges that the opening price of the China Life stock at the time of the IPO was $18.68 and that the stock quickly rose to $23.28 the first day of trading, December 17, 2003. The stock then rose to its

peak of $34.75 on December 29.

The prospectus that China Life filed as part of its registration statement contained historical financial information from 2000-2003. Because China Life did not exist independently before 2003, the bulk of the information in the prospectus pertained to Old CLIC. Because China Life would continue only a portion of the business of Old CLIC, with the rest of Old CLIC's business going to New CLIC, the prospectus contained pro forma financial statements reflecting the business that was assigned to China Life.

A year earlier, in January 2003, China's National Audit Office ("NAO"), the Chinese government's highest-level audit institution responsible for auditing state-owned enterprises, began an audit of Old CLIC's 2002 finances and an investigation of its practices. The complaint alleges that China Life received a draft of the NAO audit in January 2004.

Plaintiffs allege that the prospectus for the stock offering of China Life was false and misleading because it failed to disclose that China Life was being audited by the NAO, and failed to disclose certain accounting irregularities of Old CLIC, later found by the NAO.

The complaint describes an inquiry made by the Chinese Ministry of Finance, which apparently started in 2002 and was completed in early 2003. The complaint does not allege that any sanctions were imposed by the Ministry on any of the China Life entities. There is no allegation that anything about the Ministry of Finance inquiry needed to be disclosed in the China Life

prospectus for the IPO.

After the IPO, the business press began publishing articles purporting to describe the NAO audit and its findings. On January 30, 2004 Bloomberg News reported that the NAO had found that more than 35 billion yuan ($4.2 billion) was misappropriated from China Life Insurance Co., the nation's biggest insurer, and Industrial & Commercial Bank of China, the largest lender. A February 3, 2004 Bloomberg News article reported on some alleged details of the NAO's findings. An article in Xinhua Financial Network News published that same day disclosed that the NAO had found improper and illegal activities involving billions of yuan.

The complaint alleges that these reports caused China Life's stock to fall from $29.39 on January 29, 2004 to $26.63 on February 6, 2004 on the NYSE. The fact is that the stock had previously moved very quickly off its high of $34.75, and was mostly in the $29 range beginning in mid-January. The price was $29.39 on January 29, as alleged in the complaint, and did drift down to $26.63 by February 5 (not February 6, as the complaint alleges).

In response to these articles, China Life made statements to the financial press about the NAO audit, to the effect that the problems were attributable to Old CLIC rather than China Life. China Life filed a Form 6-K with the SEC essentially to the same effect. Plaintiffs allege that these statements reassured the market, pushing the stock price up to $30.10, but were false and misleading because the NAO findings involved China Life in that

China Life included Old CLIC's financial information in its prospectus. Further, plaintiffs allege, because of the "continuing close inter-relationship between New CLIC and China Life," any fines or other liabilities incurred by New CLIC had the potential to damage China Life.

Although the complaint does not specify the date of the $30.10 price, the date was in fact February 17. The stock had been gradually rising from the $26.63 price of February 5, and was in the $28-$29 range in the days before February 17. After February 17, the stock drifted downward from $30.10 over the coming weeks and closed at $25.01 on March 31.

On March 30, 2004 the NAO issued its Audit Decision and this decision was summarized in a Form 6-K, filed by China Life with the SEC on April 7, 2004. The decision did not correspond with the inflammatory financial press items of February. It found wrongdoing only as to Old CLIC, and not as to the China Life sued in this litigation, or even New China Life. Financial sanctions were to be paid by Old CLIC, not by China Life, and the amount was equal to 8.15 million U.S. dollars, a very small amount considering the size of CLIC. The price of China Life stock rose to $26.88 on April 7 from $24.83 on April 6.

The complaint fails to describe the March 30 audit decision or the April 7 Form 6-K. The complaint does not refer to the rise in the stock price at the time of the filing of the Form 6-K. Of course, these events effectively put an end to any claim regarding non-disclosure of the NAO audit, as will be

described later in this opinion. But by omitting any reference to these events, the complaint is in effect asserting that the alleged wrongful non-disclosure of the NAO audit continued into April, and indeed continued during the time of an SEC investigation.

Plaintiffs allege that China Life failed to disclose facts about an SEC investigation. The complaint asserts that, shortly after the middle of March, the SEC "began to investigate the accounting irregularities that the NAO had exposed in China Life's prospectus," and that on March 31 Bloomberg News reported the existence of the "probe." It is alleged that on April 1 the Associated Press announced the "SEC investigation" and stated that a spokeswoman at China Life's headquarters in Beijing stated that the company was "aware of the SEC probe but denying wrongdoing." The complaint asserts that on April 1 the Financial Times reported the "probe" of the SEC, and stated that there were simultaneous regulatory inquiries in Hong Kong.

China Life's stock dropped from $25.01 on March 30 to $23.92 on April 1.

Plaintiffs allege that on April 2 China Life "issued a series of denials that it was aware of the SEC probe, contradicting the admissions made the day before." According to the complaint, one of these was a Form 6-K filed by China Life with the SEC, in which "defendants claimed that they had not received notice of the SEC inquiry."

It is true that China Life filed a Form 6-K on April 2. The Form 6-K

incorporated an announcement which China Life had made in Hong Kong on April 1. The announcement stated:

> We have been aware of certain media reports which allege that the U.S. Securities and Exchange Commission has started an informal inquiry (the "Inquiry") on the Company. To the best knowledge of the Company, it has not received any notice from the U.S. Securities and Exchange Commission in relation to the Inquiry. The Company will cooperate fully with any inquiry made by the applicable regulators in Hong Kong and the United States of America. The Company will make further announcements as necessary when additional information becomes available.

Another alleged April 2 denial was in the form of a statement by China Life said to have been given to Business Report, denying that China Life had received notice of an SEC probe. The third alleged denial is claimed to have been published in BBC News UK edition, which stated that China Life denied being contacted by the SEC regarding an investigation. It is also alleged that the BBC publication stated that China Life denied that the NAO findings had any implications for China Life.

The complaint asserts that the statements made on April 2 in the Form 6-K and to Business Report and to the BBC publication were false, and that they inflated the price of China Life stock, and "prevented any further decline due to the disclosure of the investigation."

The facts are altogether different. There is no evidence that China

Life received any notice of an inquiry from the SEC in late March or early April, or at any time before April 26, as will be described shortly. Thus, the denials of notice in early April were true. As to any possible relationship between an SEC inquiry and the NAO audit, the SEC was advised no later than April 7 that the NAO audit made no findings against China Life. As to the claim that the alleged denials regarding an SEC inquiry inflated the price of China Life stock, the fact is that the rise in the price of the stock in early April was the result of the favorable news about the NAO audit, as shown by the following.

The level of the price on April 1, after the Bloomberg News report, was $23.92. The stock rose to $28.88 on April 7, the day the Form 6-K was filed announcing the results of the NAO audit. The price was $26.54 on April 8; there was no trading April 9; and the price was $26.59 on the next trading day, April 12.

Before discussing the further trend of the stock price, it is necessary to deal with the events which occurred later in April at the end of the period of time involved in this action. The record shows that the first notice China Life had of any SEC inquiry was in a letter of April 26 from the SEC to the "Custodian of Records" of China Life, care of its law firm in New York. The caption of the letter was, <u>In the Matter of China Life Insurance Company Limited HO-09902</u>. The letter began by stating:

> The staff of the Commission's Division of
> Enforcement is conducting this informal

> inquiry relating to the above-referenced matter.

The letter did not refer to any prior communication by the SEC to China Life. The letter and a lengthy attachment went on to make the most broad and general request for documents and information regarding the China Line IPO. No specific issues or questions about wrongdoing were indicated in any way. The SEC letter concluded by stating:

> This inquiry is confidential and should not be construed as an indication by the Commission or its staff that any violations of law have occurred, or as a reflection upon any person, entity or security.

On April 28, China Life filed a Form 6-K, which quoted a public announcement which China Life had made that day. The announcement stated that China Life had received an informal inquiry, dated April 26, from the SEC requesting that the company produce documents and other information. The announcement also referred to the part of the April 26 SEC letter stating that the inquiry should not be construed as any indication of a violation of law.

Exactly what China Life did in response to the April 26 letter, by way of producing documents and other information, is not part of the record in the present case. However, there is no claim that the SEC inquiry ever developed into anything of substance. There is no indication that the SEC made any finding of impropriety on the part of China Life. Indeed there is no

indication of even claims, or charges, or issues of substance being raised by the SEC. It appears that the SEC simply dropped the inquiry.

However, it is appropriate to deal with plaintiffs' claim about the loss which they allegedly suffered in April. Plaintiffs claim they suffered a loss when the stock "dropped steadily" from $26.59 on April 12 to $21.76 on April 28, a "loss" of $4.83 per share. It was, of course, on April 28 that China Life filed its Form 6-K, stating that it had received notice of the SEC inquiry. This was the last day of the period covered by the lawsuit.

Plaintiff's reliance on the idea of a loss caused by an alleged drop from $26.59 on April 12 to $21.67 on April 28 leaves out certain facts about the action of the China Life stock price. Nothing happened on April 12 that had any significance to the securities fraud claim. It was on April 28, not on April 12, that China Life filed its Form 6-K, stating that it had received notice of the SEC inquiry. The China Life stock declined from $23.28 on April 27 to $21.76 on April 28 - a drop of $1.52 per share.

## Discussion

To have a valid claim under Section 10(b), plaintiffs must show that defendants made misstatements or omissions of material fact, with scienter, in connection with the purchase or sale of securities, and that plaintiffs' reliance on such statements proximately caused the claimed loss. See In re IBM Corporate Securities Litigation, 163 F.3d 102, 106 (2d Cir. 1998). In connection with the loss issue, the Private Securities Litigation Reform Act of

1995 provides that "in any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

The causation requirement referred to in the statute has come to be referred to as "loss causation." Loss causation is defined as the causal link between the misconduct alleged to have occurred and the economic loss suffered as a result. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003). The Supreme Court dealt with the meaning of loss causation in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005). There, the Ninth Circuit had held that a plaintiff who alleged that the price of the stock on the date of purchase was inflated due to a misrepresentation by the defendant had adequately pleaded causation under 15 U.S.C. § 78u-4(b)(4). The Supreme Court reversed, and held that the allegation of price inflation at the time of purchase is insufficient to allege the economic loss causation required by the securities laws. Id. at 343.

The leading Second Circuit case addressing loss causation is Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005). This case was decided shortly before Dura but is consistent with Dura. The court stated that it is not enough to allege that a defendant's misrepresentations caused a disparity between the price paid for the security and its true investment quality at the time of the acquisition. Id. at 175. The court further stated

that, to establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of loss suffered in the sense that the misstatement or omission concealed something from the market that, when disclosed or corrected, negatively affected the value of the security. Id. at 174-75. The court also spoke of loss causation as involving a concealed risk which materializes and causes a loss. Id. at 177.

The complaint in the present case makes a claim about causation which is completely contrary to the law as laid down by the above authorities. The relevant allegations are contained in paragraphs 114 and 115 of the complaint, which allege:

> 114. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for China Life publicly traded securities, paying prices as high as $34.00 per share for shares trading at [sic] substantially less than that. Plaintiffs and the Class would not have purchased China Life publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.
>
> 115. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of China Life publicly traded securities on both the NYSE an the HKSE during the Class Period.

Dura and Lentell make it clear that a plaintiff in a federal securities action cannot recover on the basis of a claim that he paid more than he should have for the securities because the price was inflated by fraud. But it is this kind

of a claim, and no other, which is made in the complaint in this action.

When the issue of loss causation was raised by defendants on the present motion, plaintiffs responded by attempting to make a claim regarding loss which is in accordance with the controlling case law. The exact definition of this revised claim is far from clear. However, the following is a summary of it, as far as the court can tell.

Plaintiffs assert that the prospectus issued in connection with the IPO failed to disclose that there were accounting irregularities in the financial statements presented, and further failed to disclose that an investigation was being made by the NAO, and that the omission of this information from the prospectus caused the price of the stock to be inflated. But in their re-defined claim of loss causation, plaintiffs claim that a disclosure or correction, at least to some degree, came about through the press reports appearing at the end of January and in early February 2004. This alleged disclosure caused the stock price to drop from $29.39 on January 29 to $26.63 on February 5. At the argument of the motion, there was a suggestion by plaintiffs' attorney that some members of the class who sold at the lower price might be able to recover the $2.76 per share, representing the difference between the price on January 29 and the price on February 5.

However, it is apparent that what plaintiffs are really seeking, as they now put their loss claim, is to recover based upon the drop in the price from $26.59 on April 12 to $21.76 on April 28. This is a difference of $4.83

per share. Plaintiffs' theory is that there were news reports about an SEC investigation beginning at the end of March and that defendants were, in effect, denying these reports after that, resulting in the inflation of the stock price. This compounded their alleged wrongful failure to disclose the NAO audit and accounting irregularities involved in that audit. Plaintiffs claim that there was a loss from the inflated April 12 level of $26.59, after the stock "dropped steadily" to $21.76 on April 28, the date of the Form 6-K, in which China Life stated that it had been notified of the SEC inquiry.

Plaintiffs' revised theories of loss causation (revised from the claim in the complaint) are without merit.

In the first place, the press reports of late January and early February were not disclosures of corrective information. They were highly inaccurate. They suggested that there might be billions of dollars in sanctions assessed by the NAO, which might be imposed, at least to some extent, on China Life.

As it turned out there was no loss whatever resulting to China Life or its stock price when the actual facts about the NAO audit came out. There was no disclosure of adverse facts which caused the price of the stock to drop, resulting in a loss to investors. On the contrary, when the audit decision of the NAO was reported in China Life's Form 6-K filed April 7, 2004, the stock rose from $24.83 on April 6 to $26.88 on April 7.

There is no valid claim of loss causation in connection with the

NAO audit. Beyond this there really was no misrepresentation in the IPO prospectus or in the subsequent statements made by China Life. The NAO audit had no material bearing on China Life, as demonstrated by the audit decision.

It is now necessary to deal with the claim which plaintiffs emphasized most heavily in their re-defined loss theory. It is the claim relating to the decline in value of the China Life stock from $26.59 on April 12 to $21.67 on April 28. One serious problem with the complaint is that, in dealing with the events that supposedly led up to this stock price decline, the complaint fails to mention the favorable March 30 audit decision of the NAO, or the April 7 Form 6-K, or the rise in the price in the China Life stock. The complaint in effect asserts that the alleged non-disclosures about the NAO audit continued through April to the end of the class period, and that these misrepresentations were compounded by the alleged denials about the SEC inquiry. It is claimed that these compound misrepresentations resulted in the loss caused by the drop in the stock price that month.

None of this has any validity whatever. It is clear, and the court has just so found, that there were no misrepresentations about the NAO audit. In any event, any possible problem in this regard was put to rest by the March 30 audit decision and the April 7 Form 6-K, and the resulting rise in the price of the stock. Thus, as far as the NAO issue is concerned, there was no misrepresentation and no loss.

This leaves only the issue about the SEC inquiry. The court finds that China Life made no misrepresentation and made no incorrect "denials" with regard to the SEC inquiry. The Form 6-K of April 2 and the other information attributed in the press to China Life at the time were true. The court further finds that the price of the China Life stock at the time in question - early April - was not inflated by any misrepresentation made by China Life. But even if there was a misrepresentation and improper stock price inflation, there is no valid claim of loss causation based on the difference between the price on April 12 and the price on April 28. Nothing occurred on April 12 of any significance to the issue of loss causation. This was not the date of any correction or any corrective information coming into the market. The new information came with the filing of the Form 6-K on April 28, which was followed by a small drop in the price of China Life stock. However, plaintiffs make no claim that this minor price reduction constituted their loss. In any event, there had been no misrepresentations about the SEC inquiry, and the April 28 Form 6-K was not a correction of misrepresentations.

The Court concludes that there is no triable issue of fact regarding any of plaintiffs' claims of misrepresentation or of plaintiffs' claims of loss causation. There is no merit to any of these claims.

## Subject Matter Jurisdiction

Defendants assert that the court lacks subject matter jurisdiction over claims asserted by foreign purchasers of China Life on the Hong Kong

Stock Exchange ("HKSE"). Subject matter jurisdiction over securities fraud claims involving foreign transactions exists only where there is a sufficient connection to the United States. See In re Bayer AG Sec. Litig., 2004 WL 2190357, at *17 (S.D.N.Y. Sept. 30, 2004). Jurisdiction is properly asserted in such cases if either a "conduct test" or "effects test" is met. See SEC v. Berger, 322 F.3d 187, 193, 195 (2d Cir. 2003).

The conduct test is met when (1) the defendants performed activities in the United States that were more than "merely preparatory" to a fraud carried out elsewhere; and (2) these activities or failures to act in the United States "directly caused" the claimed losses. Interbrew v. Edperbrascan Corp., 23 F. Supp. 2d 425, 429 (S.D.N.Y. 1998). Under the effects test, jurisdiction is proper if the defendant's conduct abroad has a "substantial" impact in the United States. The effects test recognizes that conduct outside the United States can be "detrimental to the interests of American investors." Schoenbaum v. Firstbrook, 405 F.2d 200, 208 (2d Cir. 1968). The cases developing these tests are well summarized in Interbrew, 23 F. Supp. 2d at 429.

Arguing that the conduct test is a basis for jurisdiction, plaintiffs allege that there was significant activity in the United States, namely filings with the SEC, a "roadshow" conducted in the United States, and communications with American media. However, they do not show that any of this activity in the United States "directly caused" losses to foreigners who

purchased their stock on the HKSE. Plaintiffs rely on the fraud-on-the-market doctrine. But, as the court recently noted in In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453, 466 (S.D.N.Y. 2008), courts that have considered this "global fraud-on-the-market theory" have expressed concern that "allowing foreign purchasers on foreign exchanges to plead reliance in this manner would extend the jurisdictional reach of the United States securities laws too far." As in AstraZeneca, absent clear guidance from the Second Circuit, the court declines to adopt this theory.

Under the effects test, there is jurisdiction where conduct abroad has a substantial impact in the United States. This would include residents of the United States who purchased shares on the HKSE. See Schoenbaum, 405 F.2d at 208. However, the basic purpose of applying the effects test is to protect American investors. It does not provide a basis for allowing claims by foreigners who purchased shares in China Life on the HKSE.

## Conclusion

The court rules that there is no subject matter jurisdiction over claims by foreigners who purchased China Life stock on the Hong Kong Stock Exchange. There is subject matter jurisdiction over claims by purchasers on the New York Stock Exchange or any other exchange in the United States, or Americans who purchased anywhere.

As to the claims over which the court has jurisdiction, the court has before it a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6).

The court rules under Rule 12(d) that this motion should be treated as a motion for summary judgment under Rule 56. As such, the motion is granted and the complaint is dismissed.

SO ORDERED.

Dated:    New York, New York
          September 3, 2008

_____
THOMAS P. GRIESA
U.S.D.J.